UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BORIS ROGINSKY,

                              Plaintiff,

v.

M&T BANK,

                              Defendant.

---

**REPORT AND
RECOMMENDATION**

19-cv-1613(LJV)(JJM)

---

       Plaintiff Boris Roginsky alleges national origin, religious and age discrimination, as well as retaliation, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§2000e, *et seq.* ("Title VII"), the Age Discrimination in Employment Act, as amended, 29 U.S.C. §§621 *et seq.* ("ADEA"), and the New York State Human Rights Law, N.Y. Executive Law §§290, *et seq.* ("NYSHRL"), against defendant M&T Bank ("M&T"), his former employer. Verified Complaint [1].[1]   Before the court is M&T's motion for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56 [33], which has been referred to me by District Judge Lawrence J. Vilardo for initial consideration [8].  Having reviewed the parties' submissions [33, 38, 41], and heard oral argument [42], I recommend that the motion be granted.

**BACKGROUND**

       In August 2013, Roginsky, a Jewish immigrant from Russia, began his employment with M&T in a managerial information technology position. M&T's Statement of

---

[1]       Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF pagination.

Undisputed Facts [33-2], ¶¶12-13; Roginsky's Opposing Statement of Facts [38-3], ¶13. Roginsky worked at M&T's Amherst, New York facility on a floor with approximately 1,000 other M&T employees. M&T's Statement of Undisputed Facts [33-2], ¶36, 41. Roginsky's Verified Complaint [1] details extensive discrimination perpetrated by co-workers and supervisors that Roginsky experienced both within, and outside of, the workplace throughout his employment with M&T, which ended with his resignation in January 2019.[2] Roginsky alleges that the discrimination which he endured, even at the early stage of his employment with M&T, was "so bad" that he "needed heart surgery in 2014". Verified Complaint [1], ¶13.

### Co-Worker Harassment

The Verified Complaint alleges that Roginsky experienced a variety of discrimination, much of which was perpetrated by unidentified coworkers. This included verbal harassment:

-- he was "called a 'dirty Jew', 'stinky Jew', 'crazy Russian', 'thief', and 'cheater' on numerous occasions" ([1], ¶16);

-- "[e]mployees of [M&T] even talked about [his] wife, calling her derogatory names" (id., ¶26);

-- co-workers stated "'he stinks' and 'he is sexist'" (id., ¶37);

-- Zal Ansari, a co-worker, told Roginsky that he "'hopes [his] dad dies'" when Roginsky's father was ill (id., ¶42);

-- "someone said they knew 'Russians are not team players'" (id., ¶52); and

---

[2]    A verified complaint may be treated "as an affidavit for summary judgment purposes", but "the allegations contained therein can suffice to defeat summary judgment only insofar as they were made on personal knowledge". Curtis v. Cenlar FSB, 654 F. App'x 17, 20 (2d Cir. 2016) (Summary Order). *See also* Endemann v. Liberty Insurance Corp., 2022 WL 1434709, *2 (N.D.N.Y. 2022); Harnage v. Dzurenda, 2022 WL 972438, *2 (D. Conn. 2022).

-- he overheard a co-worker state "'we need to dump in to Moscow'" (id., ¶64).

Other discriminatory acts included:

-- "[e]mployees . . . would drop money on the floor and hope that [he] would pick it up so they could accuse him of being a thief" (id., ¶22);

-- "in or about February 2015, [Roginsky] was attending a friend's wake at a local hotel. Bank employees, Julieta Ross, Joe Hasset [sic], and Joe Morrison where [sic] at the same venue for a Bank event. They followed [him] and caused a scene" (id., ¶28); and

-- "someone from the Bank stated 'the thieves are coming'" as he and his wife entered a store (id., ¶31).

Roginsky's claims of discrimination even go so far as to allege that M&T employees had him followed outside of the country and sought to scare and harm him.  For instance, he alleges:

-- "Mr. S. Ziskind observed [Roginsky] while he was on vacation with his family in the Dominican Republic for his 25th wedding anniversary.  Upon information and belief . . . Mr. Todaro rewarded Mr. Ziskind for doing this by hiring his son as Bank SVP" (id., ¶30);

-- "[s]omeone once placed a map of Russia on [his] lawn at his residence. Bank employees tried to scare [him]" (id., ¶32); and

-- on September 11, 2018, "Joe Morrison asked Chris Lightcap if he should 'rough' [him] up" (id., ¶53).

**Supervisory Harassment**

Roginsky reported to three supervisors during his tenure with M&T:  Peter Beno (August 2013 to September 2014); Randal Chestnut (September 2014 to June 2016); and Joseph Hassett (June 2016 to January 23, 2019). M&T's Statement of Undisputed Facts [33-2], ¶¶26-29.

Roginsky alleges that Beno "bragged about his grandfather being associated with Hitler"
Verified Complaint [1], ¶19.  He also testified that Beno stated that "he likes to deal with a tough
Russian" and that these comments occurred in late 2013 or early 2014. M&T's Statement of
Undisputed Facts [33-2], ¶¶51, 52.  While Roginsky was "optimistic that his work conditions
would improve" under Chestnut, the work environment allegedly "got worse". Id., ¶¶15, 16.
This allegedly continued under Hassett, who "harassed . . . [him] on an almost daily basis". Id.,
¶33.

### Roginsky's Reassignment

In or around the first quarter of 2017, senior management at M&T implemented a
new "Data Quality" effort that Hassett was placed in charge of implementing. M&T's Statement
of Undisputed Facts [33-2], ¶¶76(a), (b).  Since Roginsky possessed the necessary skill set to
accomplish the Data Quality initiative, Hassett made a managerial decision to assign Roginsky to
the new Data Quality role. Id., ¶76(c).  Roginsky, who was the most highly compensated
manager of Hassett's staff, retained the same title and continued to receive the same salary in his
new role.  Id., ¶¶76(g)-(i).  No M&T employee told Roginsky that this was a demotion. Id.,
¶76(f).  In fact, according to Hassett, the Data Quality effort was of "high visibility" at M&T,
and provided Roginsky with "new opportunities", including the ability "to build his own team".
Hassett Declaration [41-2], ¶3.

Roginsky paints a very different picture, characterizing his new role as of "lower
significance and prestige", including a significant reduction in the number of employees who
reported to him. Roginsky Affidavit [38], ¶¶5, 7.  He claims that his prior responsibilities were
given to Ansari even though he was not qualified. Verified Complaint [1], ¶34.

In his new Data Quality role, Roginsky states that Hassett instructed him "to get [his] own work, even though that role usually relied upon the instruction of management to determine what work there was to be done". Roginsky Affidavit [38], ¶6.  Roginsky also contends that following the reassignment he was excluded from e-mails and meetings, and that Hassett, Ansari and Morrison did not want him to partner with "central technology projects". Verified Complaint [1], ¶¶36, 39.  Roginsky states that he learned from another M&T employee, Jeremy Kirsh, that Kirsh had overheard Morrison make belittling jokes about Jewish people. Roginsky deposition testimony [38-3] at 106-07.  Morrison denies making these comments or other otherwise discriminating or harassing Roginsky in any manner. Morrison Declaration [33-37], ¶¶10-11.

### Roginsky's Use of M&T's Complaint Procedure

Throughout Roginsky's tenure, M&T maintained a "Sexual and Other Unlawful Harassment Policy" that prohibited various forms of discrimination and provided a procedure for reporting such conduct. M&T's Statement of Undisputed Facts [33-2], ¶¶19-20.  Under the reporting procedure, employees were required to cooperate in the investigation. Id., ¶22. Roginsky was aware of this policy and the process for submitting complaints. Id., ¶25.

Roginsky testified that he reported Beno for "inappropriate behavior towards associate" in "either [the] end of 2013 or beginning of 2014" (Roginsky deposition transcript [33-9] at 37), and that sometime in 2016 he spoke to Chris Suszek, a Human Resources Business Partner with M&T, about the discrimination he was allegedly experiencing. Id. at 175.  By contrast, M&T alleges that Roginsky first reported his workplace concerns in July 2018 - nearly five years into his tenure with M&T and six months before his resignation. Frank Declaration [33-20], ¶12.  At that time, Suszek informed Meghan Frank, an Employee Relations Specialist at

M&T responsible for Roginsky's business line, that Roginsky had expressed generalized concerns to him during a conversation about possible discrimination and harassment based on national origin, religion and age. M&T's Statement of Undisputed Facts [33-2], ¶¶112-13. In response to this report, Frank attempted to conduct an investigation, which began by meeting with Roginsky in July or August 2018. Id., ¶¶120-21; Roginsky's Statement of Disputed Facts [38-3], ¶121. During that meeting, Roginsky contends that he reported to Frank that he "had heard people around the office uttering discriminatory slurs toward [him], such as 'dirty Jew', 'stinky Jew,' and 'thief'", and also felt discriminated against "because Hassett had reduced [his] job responsibilities so as to effectively demote [him]". Roginsky Affidavit [38], ¶9. Frank asked Roginsky to provide a written statement and for more details to assist with her investigation. M&T's Statement of Undisputed Facts [33-2], ¶¶123-24. In an August 29, 2018 e-mail, Roginsky acknowledged Frank's request for a written statement, and stated "You can get one from my attorney". [33-27] at 2. Frank responded that she had forwarded his message to "internal legal counsel to transition their involvement", and that he or his attorney were free to follow up with M&T's counsel. Id. However, neither Roginsky nor his counsel provided a written statement at that time. M&T's Statement of Undisputed Facts [33-2], ¶130.

### Roginsky's Journal

In September 2018, Roginsky expressed his workplace harassment concerns to Lightcap, who was neither in Human Resources nor Roginsky's direct supervisor. Id. at ¶¶131-32. Shortly thereafter, they met at a restaurant to further discuss Roginsky's concerns, during which Roginsky provided Lightcap with his journal documenting the alleged harassment. Id., ¶135; Roginsky's Statement of Disputed Facts [38-3], ¶135. The approximately 25-page journal adds further detail to many of the same incidents as alleged in the Verified Complaint, including:

-- in February 2015 he attended a friend's wake that took place in a Hilton, where three co-workers "from the bank created scene at the Hilton.  The idea is get me into physical altercation, call the police and let me go" ([33-28] at 2);

-- throughout 2015 "[m]y family had been harassed outside of work as people had been hired to follow us and anywhere we went and tell us or display to us as derogatory information. Obviously someone reported us to agency with notion that we are spies" (id.);

-- in summer 2015 "[t]here [is] possibly surveillance had been placed inside of my office and my email had been monitored.  These people was thinking that my wife and I are spies" (id.); and

-- in April 2016 during a 25th anniversary trip with his family to the Dominican Republic, "agencies got involved and followed us there.  Semyon Ziskind was there as well, masked as an African American Violin player. . . . This had been spearheaded by Joe Morrison and possibly others . . . Dominican did not go as someone planned, and my family went home safe.  Victor Ziskind got hired as SVP to leas Data Modeling team Coincidence? [Don't know]" (id.).

Despite Roginsky testifying that the journal summarized the harassment and discrimination that he experienced at M&T (deposition transcript [33-9] at 148), there are very limited references to any manifestly discriminatory remarks. Instead, the journal [33-28] is comprised largely of a variety of facially neutral disjointed comments from co-workers that Roginsky believed were directed toward him.  For instance, the journal states: "Few people went by my office and made a comment:  I guess you would never be popular, have a good one" (id. at 4); Don't jerk yourself . . . when I was coming back to the office from the restroom" (id.); "walking around bathroom.  Comments: he is still lying" (id. at 5); "Zal [Ansari] Thanks Matt You will be popular" (id.); "Zal, going by my office as I am moving I would not mind [if] he

retires" (id.); "going by Michael Merkurio cube.  He says he stinks" (id.); "You think he will wash the dishes? Someone in the area left side from my cube" (id. at 6); "He is sexist" (id.); "From the floor: he is probably don't care" (id. at 7); "Someone from my left on the floor sarcastically so I can hear: What did I do? I might have a hard [*sic*] attack" (id.); "Steve Steiner screams while talking to Kellie Basher: When is he going to resign?" (id.); "talked to Kellie Basher . . . . Someone makes the comment:  He could be her lover" (id.); "getting up from my cube some[one] says cheater" (id. at 18); Morrison "screens [*sic*] he is lying, he will get us acquired" (id. at 25); "the lady came in front of my cube and says : 'he too embarrassed to talk about his depression?'" (id.); and several comments he heard about him resigning or M&T being unable to terminate him (id. at 17 ("voice from the floor he is stuck. They can't get rid of him"; "Walking in the whole way and someone whispers: 'He will resign' I called her back about dropping the paperwork in the afternoon").

Upon reviewing the contents of the journal, Lightcap became concerned that Roginsky could be suffering from a health problem and, based on a concern for Roginsky's well-being, provided it to Frank on or about September 14, 2018, believing it to be a human resources issue. M&T's Statement of Undisputed Facts [33-2], ¶¶136, 143-44.[3]  From her review of the journal, Frank shared Lightcap's belief that Roginsky could be suffering from a health problem. Frank Declaration [33-20], ¶18.

**M&T's Continued Investigation and Roginsky's Placement on Medical Leave**

Motivated by a concern for Roginsky's well-being and the well-being of his co-workers, Frank asked Roginsky on or about September 28, 2018 to consult with a medical doctor

---

[3]      Roginsky acknowledged that Lightcap was concerned for his well-being, but also "trying to . . . protect the interest of [M&T] and make sure that . . . nothing happened . . . outside of the office". Roginsky deposition transcript [33-9] at 213.

concerning the contents of his journal. Frank Declaration [33-20], ¶19.  In a September 28, 2018 follow-up e-mail to Roginsky, Frank repeated that M&T was "concerned for your well-being as well as that of your coworkers and it is necessary that we receive assurance from your medical professional confirming that he/she does not feel that you pose a threat to yourself or your coworkers" [33-29].

        Frank also met with Roginsky on October 2, 2018, and asked if he could identify any of the individuals on his floor who made the inappropriate comments referenced in the journal.  However, Roginsky was unable to do so, and could not even identify whether the voices he heard were male or female. M&T's Statement of Undisputed Facts [33-2], ¶149.  Repeating her earlier request from July 2018, Frank asked Roginsky at this meeting to provide a statement summarizing the alleged discrimination and harassment (id., ¶148), which she memorialized in an October 2, 2018 e-mail to Roginsky, that asked him to identify "who the allegations are against, and when, where, and who the alleged incidents involved", in order to "fully investigate" his concerns [33-30].  Roginsky responded by e-mail several days later [33-31], noting that the journal was "not meant to be shared", that he and his attorney would provide the requested written statement of his allegations, but that he did not "see any reason" for the requested statement from his physician.

        On November 2, 2018, M&T placed Roginsky on a leave of absence, with full pay, pending an independent medical examination. M&T's Statement of Undisputed Facts [33-2], ¶157.  Following the completion of the medical exam, Roginsky was cleared to return to work. Id., ¶161.  Within days of Roginsky's December 17, 2015 return to work, Frank e-mailed Roginsky another request for additional information, including the people involved in his allegations, and noted that that she would "not be able to investigate [his] concerning without the

specific information pertaining to [the] allegations" [33-32].  However, the requested statement was not provided.

## Roginsky's Resignation

In the Verified Complaint [1] Roginsky alleges that following his return from medical leave, M&T did nothing "to address the hostile work environment", and refused to consider him for other positions. Id., ¶68. In fact, the environment "was so hostile that [Roginsky] could no longer to work at the Bank because he feared further damage to his health from the continued stress of the hostile work environment", resulting in him notifying M&T on January 8, 2019 of his intent to resign. Id., ¶¶68-69.[4]  However, Roginsky's January 8, 2019 resignation letter to Hassett made no reference to these claims, but instead stated that he was resigning to "further [his] career in Information Technology and Business Strategy", and wished Hassett "good luck and continued success. [33-34] (the "decision had been difficult but needed for my personal career advancement").  Preceding his resignation, Roginsky accepted an offer of employment from Citibank with a higher base pay than what he was making at M&T. M&T's Statement of Undisputed Facts [33-2], ¶¶174-76.

## The Verified Complaint vs. Roginsky's Deposition Testimony

Despite alleging under oath to the truth of the allegations contained in the Verified Complaint, at his deposition Roginsky retreated from many of its allegations, acknowledging that he had no direct evidence linking these occurrences to M&T or its employees.  In fact, the discrepancy between portions of his deposition testimony and the allegations of the Verified Complaint was so glaring that I issued an Order to Show Cause

---

[4]    Seemingly at odds with that claim, Roginsky separately contends that he began looking for new employment around the end of 2018 because he "strongly believed [M&T] had gradually been taking measures to prepare to eventually terminate [him]".  Roginsky Affidavit [38], ¶12.

("OSC") [43] following oral argument of the motion that identified certain allegations of the Verified Complaint [1] that appeared to have no factual support whatsoever, and directed Roginsky and his counsel to show cause why they should not be sanctioned pursuant to Rule 11(c)(3). These included:

-- Paragraph 22 alleges that "[e]mployees of Defendant would drop money on the floor and hope that plaintiff would pick it hope so they could accuse him of being a thief". However, at his deposition plaintiff admitted that he was "referring to occasions where [he] would see money on the floor, but . . . wouldn't know how it got there", and when asked whether he ever "visually observe[d] someone at M and T dropping money on the floor", he replied "No, I did not" ([33-9] at 65);

-- Paragraphs 27 and 28 allege that "[p]laintiff was even subjected to harassment outside of work by Bank employees. For example, in or about February of 2015, Plaintiff was attending a friend's wake at a local hotel. Bank employees, Julieta Ross, Joe Hasset and Joe Morrison where at the same venue for a Bank event. They followed Plaintiff and caused a scene." However, at his deposition plaintiff admitted that he did not know whether any of those three individuals were at the hotel at that time ([33-9] at 81);

-- Paragraph 29 alleges that "[p]laintiff and his wife were reported to an agency that they are spies". However, when asked at his deposition "do you allege that M and T Bank reported you to an agency as a spy?", plaintiff replied "I don't believe so" ([33-9] at 86);

-- Paragraph 30 alleges that "Mr. S. Ziskind observed Plaintiff while he was on vacation with his family in the Dominican Republic for his 25th wedding anniversary. Upon information and belief, Mr. Todaro rewarded Mr. Ziskind for doing this by hiring his son as Bank SVP". At his deposition plaintiff testified that Ziskind "at some point was teaching my son violin", and that

the person whom he saw in the Dominican Republic was "maybe [a] person which look a lot like him". [33-9] at 87.  However, when asked "what, if anything, does M and T have to do with the allegations of paragraph thirty", he replied "I'm not necessarily sure . . . . Mr. Ziskind could be there as a coincidence, and in terms of M and T involvement there, I'm not sure I can provide a connection" ([33-9] at 88);

-- Paragraph 31 alleges that "[p]laintiff and his wife were entering a store and someone from the Bank stated 'the thieves are coming'." However, at his deposition plaintiff admitted that he was "not sure if it was someone from the bank who made this statement", stating "I have no support of that" ([33-9] at 89); and

-- Paragraph 32 alleges that "[s]omeone once placed a map of Russia on plaintiff's lawn at his residence. Bank employees tried to scare Plaintiff." At his deposition, plaintiff testified that "[i]t wasn't necessarily like a paper map or plastic map . . . . It was like an imprint of the map of Russia on the lawn". [33-9] at 91. However, when asked whether he "allege[d] that somebody associated with M and T Bank made this Russian imprint on [his] lawn", he replied "[w]e don't have that connection", and admitted that he does not "know whether M and T Bank had anything to do with what [he] saw on [his] lawn". Id. at 92.

After reviewing the responses of Roginsky and his counsel to my OSC [44, 45], I remained troubled, but ultimately elected not to sanction either Roginsky or his counsel. Nevertheless, Roginsky's deposition testimony significantly erodes his ability to oppose M&T's motion.

**DISCUSSION**

**A.      Summary Judgment Standard**

      "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant.  Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

      It is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases . . . . [T]he salutary purposes of summary judgment - avoiding protracted, expensive and harassing trials - apply no less to discrimination cases than to other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).  As in any other case, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

**B.      The Scope of Roginsky's Claims**

      M&T addresses Roginsky's ADEA claim "out of an abundance of caution", but argues that no such claim was pled in the Verified Complaint. M&T's Memorandum of Law [33-

1] at 16 n. 2.  While the Verified Complaint [1] did not include a separate cause of action for age discrimination, it alleged that Roginsky experienced discrimination because of his age (*see* id., ¶¶50, 62), and expressly stated in the prefatory paragraph that it sought relief "for violations of Plaintiff's rights under the [ADEA]". Id., ¶1. Therefore, I conclude that the Verified Complaint sufficiently alleges an ADEA claim. *See* In re Denney, 2007 WL 4302770, *7 (Bankr. W.D. Wash. 2007) (even where the claim was not pled as a separate cause of action "[t]he Defendants had fair notice that relief was also being sought"); Batson v. United Parcel Service, Inc., 2012 WL 4482782, *2 (S.D. Cal. 2012) ("[a]lthough the original complaint did not set forth a separate PAGA claim, it was clear that Plaintiff was seeking civil penalties under the PAGA").

## C.     The Timeliness of Roginsky's Allegations

### 1.     Title VII/ADEA: Discrete Acts

"Title VII [and] the ADEA . . .  require a Plaintiff to file a claim with the EEOC within 300 days of an alleged adverse action." Wade v. New York City Department of Education, 2014 WL 941754, *5 (S.D.N.Y. 2014), aff'd, 667 F. App'x 311 (2d Cir. 2016) (Summary Order). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  Hence, "the only adverse actions properly under consideration . . . are those occurring between [300 days prior to] the date of the EEOC submission." Dunn v. URS Corp., 2015 WL 220990, *5 (S.D.N.Y. 2015).

Since Roginsky filed his Charge of Discrimination on January 16, 2019 [1-2], M&T argues that "conduct alleged by Roginsky that occurred before March 22, 2018 (300 days

before January 16, 2019) is time-barred under Title VII". M&T's Memorandum of Law [33-1] at 29. I agree that all alleged discrete acts of discrimination that form the basis for Roginsky's claims under either Title VII and the ADEA that occurred prior to March 22, 2018 are time-barred.

### 2.    NYSHRL: Discrete Acts

Since "claims under the NYSHRL . . .  are time-barred unless [the action is] filed within three years of the alleged discriminatory acts", <u>Kassner v. 2nd Ave. Delicatessen Inc.</u>, 496 F.3d 229, 238 (2d Cir. 2007), M&T contends that conduct that "occurred before November 26, 2016" - three years prior to the commencement of this action - is time-barred.  <u>Id</u>.  In the absence of any opposition from Roginsky, I agree.[5]

### 3.    Continuing Violation Doctrine

"Under the continuing violations doctrine, a hostile work environment claim, unlike a discrete employment action, will be treated as a continuing violation where the claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." <u>Zagerson v. New York City Department of Education</u>, 2022 WL 292917, *13 n. 18 (S.D.N.Y. 2022). "Courts apply the same standard to determine whether a hostile work environment is a continuing violation under Title VII, the NYSHRL", or the ADEA. <u>Id</u>. *See* <u>Subramanian v. Prudential Securities, Inc.</u>, 2003 WL 23340865, *4 (E.D.N.Y. 2003) ("[t]he distinction between discrete acts and a hostile work environment . . .  also applies to ADEA").

---

[5]    Although not argued by Roginsky, "[c]ourts in this circuit have determined that the statute of limitations applicable to claims under NYSHRL is tolled during the period in which a complaint is filed with the EEOC." <u>Gittens v. Winthrop Hospitalist Associates, P.C.</u>, 2022 WL 504490, *3 (E.D.N.Y. 2022).  *See also* <u>DeNigris v. N.Y.C. Health and Hospital Corp.</u>, 861 F. Supp. 2d 185, 192 (S.D.N.Y. 2012).

Roginsky does not dispute that the discrete discriminatory acts that occurred prior to the dates set forth above are time-barred.  Instead, he correctly notes that to the extent that his hostile work environment claims are based on continuing conduct, the entirety of that conduct can be considered timely. Roginsky's Memorandum of Law [38-4] at 18-21.

## D.    Discrimination

Discrimination cases based on circumstantial evidence brought pursuant to Title VII are analyzed under the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  The same framework is applied to NYSHRL and ADEA claims. See Gachette v. Metro-North Commuter Railroad Co., 804 F. App'x 65, 67 (2d Cir. 2020) (Summary Order); Gallegos v. Tompkins Consolidated Area Transit, Inc., 785 F. App'x 16, 17 (2d Cir. 2019) (Summary Order).

Under the McDonnell Douglas framework, a plaintiff must establish a *prima facie* claim of discrimination by demonstrating:  "(1) that []he is a member of a protected class; (2) that []he was qualified for employment in the position; (3) that []he suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation". Littlejohn v. City of New York, 795 F.3d 297, 307 (2d Cir. 2015).  If a *prima facie* showing is made, the burden of production shifts to the employer "to come forward with its justification for the adverse employment action against the plaintiff", shifting the burden back to the "plaintiff to show that the defendant's stated reason is pretextual". Id. at 307-08.  The burden at the final step of that framework "differs between Title VII and the ADEA: while the final step under Title VII requires pretext sufficient to show that unlawful discrimination was a 'motivating factor' in the employment action, the final step under

the ADEA requires pretext sufficient to show that age-based discrimination was the 'but-for cause' of the action". <u>Delville v. Firmenich Inc.</u>, 920 F. Supp. 2d 446, 459 n. 8 (S.D.N.Y. 2013); <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 106 (2d Cir. 2010) (under the ADEA, unlike Title VII, a plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor").

Since courts do not "sit as a super-personnel department that reexamines employers' judgments", <u>Ya-Chen Chen v. City University of New York</u>, 805 F.3d 59, 73 (2d Cir. 2015), it is not enough for a plaintiff to disagree with an employer's personnel decision.  Instead, the plaintiff must offer sufficient evidence for a jury to find pretext. *See* <u>Reichert v. Perdue</u>, 786 F. App'x 294, 298 (2d Cir. 2019) (Summary Order) ("[i]n the absence of evidence that these decisions were motivated by . . . discrimination, we will not 'sit as a super-personnel department that reexamines [the employer's] judgments'"); <u>Zenie v. College of Mount Saint Vincent</u>, 2021 WL 6105373, *1 (2d Cir. 2021) (Summary Order) ("because Zenie . . . presents no evidence that the College's [personnel decision] was pretext for discrimination, we must defer to the College's judgment").

The parties' briefs focus on three allegedly adverse actions:  Roginsky's reassignment to the Data Quality role, the denial of promotions, and his placement on medical leave.

1.      **The Reassignment**

a.      **Title VII and ADEA**

M&T argues that Roginsky's Title VII claims arising from his reassignment to the Data Quality role in the first quarter of 2017 are outside of the Title VII limitations period - *i.e.*,

on or after March 22, 2018. M&T's Memorandum of Law [33-1] at 29.  For the reasons

discussed above, I agree.  Although not argued by M&T, the same holds true for Roginsky's

ADEA claims. *See* Wade, 2014 WL 941754 at *5; Mitchell v. New York City Department of

Education, 2022 WL 621956, *7 (S.D.N.Y. 2022) (the plaintiff's "Title VII and ADEA claims

are time-barred to the extent they are based on discrete discriminatory acts that took place more

than 300 days before that date").  Therefore, I recommend that this portion of the claim be

dismissed.

### b.    NYSHRL

M&T challenges two components of Roginsky's *prima facie* case - whether he

sustained an adverse employment action, and whether that adverse action occurred under

circumstances giving rise to an inference of discrimination. *See* M&T's Memorandum of Law

[33-1] at 17; Roginsky's Memorandum of Law [38-4] at 4.  First, M&T contends that

Roginsky's reassignment was an adverse employment action because it "never demoted him,

reduced his pay or title, or materially diminished his work responsibilities". M&T's

Memorandum of Law [33-1] at 8.  Much of M&T's showing is built on the fact that Roginsky

remained the highest compensated manager on Hassett's staff, and continued in a "management-

level position" with the same title, but with "high visibility". Hassett Reply Declaration [41-2],

¶3; Hassett Declaration [33-33], ¶5.

However, as Roginsky notes (Memorandum of Law [38-4] at 4-5), "[a] plaintiff

can show an adverse employment action where, even though []he was transferred to a job with

the same rank and pay, the new position . . . entailed diminished responsibilities".  Williams v.

Alliance National Inc., 24 F. App'x 50, 53 (2d Cir. 2001) (Summary Order). *See also* Williams

v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) ("an involuntary transfer may

constitute an adverse employment action if the plaintiff 'show[s] that the transfer created a materially significant disadvantage' with respect to the terms of her employment"). As a result of the reassignment, Roginsky went from supervising between eight and ten associates to one - an arguable diminishment in responsibilities for one in a management-level position. *See* Roginsky deposition transcript [33-9] at 25-26; Statement of Additional Undisputed Facts [38-3], ¶4.

In response, M&T notes that Hassett told Roginsky that "he would be able to build his own team in this new Data Quality role" (Hassett Reply Declaration [41-2], ¶3), which is corroborated by Roginsky's own journal. *See* [33-28] at 2 ("Hasset [*sic*] promised me to build out data team"). However, even if the reduction in Roginsky's personnel responsibilities was only temporary, Roginsky contends that his reassignment led to reductions in other areas of his managerial responsibilities. *See* Roginsky Affidavit [38], ¶5 ("[t]he data quality role that I was reduced to was just one of the many areas of responsibility I had previously performed.  Hassett effectively took away many of my managerial responsibilities and left me with only one part of the job I had previously had").[6]

Giving Roginsky the benefit of every favorable inference on this motion (as I must), he has offered sufficient evidence to satisfy his *prima facie* burden of establishing that his reassignment constituted an adverse employment action. *See* Zuffante v. Elderplan, Inc., 2004 WL 744858, *5 (S.D.N.Y. 2004) (finding that a material issue of fact existed as to whether a transfer constituted an adverse employment action where, in his new role, the plaintiff reported to someone of lower seniority and had diminished responsibilities); Rodriguez v. Board of

---

[6]     Roginsky also points to the fact that following his reassignment to the Data Quality role, he was relocated from his office to an "isolated cubicle". Verified Complaint [1], ¶39. However, it is undisputed that the decision to relocate Roginsky to a "supervisory cubicle" was not made by Hassett, but rather by Lightcap, Hassett's superior, because Lightcap had hired a new employee that directly reported to him who was senior to Roginsky. M&T's Statement of Undisputed Facts [33-2], ¶¶76(j), (k); Lightcap Declaration [33-35], ¶2.

Education of Eastchester Union Free School District, 620 F.2d 362, 366 (2d Cir. 1980) (transfer to an elementary school art program was an adverse action where it was so "profoundly different" a program that it rendered "utterly useless" the plaintiff's twenty years of experience and study in developing programs for middle school children).

However, as M&T notes, Roginsky must also establish that the adverse employment action arose under circumstances giving rise to an inference of discrimination - an independent element. *See* M&T's Reply Brief [41] at 7; Watkins v. Astrue, 2007 WL 9700779, *5 (N.D. Ga.), adopted, 2007 WL 9700780 (N.D. Ga. 2007) ("[t]he existence of an adverse employment action and the existence of proof allowing an inference of discrimination are separate and independent elements of plaintiff's *prima facie* case. Plaintiff must show both"). "Inference of discrimination is a flexible standard that can be satisfied differently in differing factual scenarios." Patton v. Ford Motor Co., 2017 WL 2177621, *9 (W.D.N.Y. 2017). "A plaintiff can establish an inference of discrimination in various ways, through direct or indirect evidence." Hurban v. United Health Services Hospitals, Inc., 2018 WL 1069176, *11 (N.D.N.Y. 2018). "The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus", Chertkova v. Connecticut General Life Insurance Co., 92 F.3d 81, 91 (2d Cir. 1996), or evidence that the plaintiff was subjected to disparate treatment compared to persons similarly situated to himself.  *See* Holtz v. Rockefeller & Co., 258 F.3d 62, 77 (2d Cir. 2001) ("[i]t is true that evidence of disparate treatment may establish the inference of discrimination necessary to satisfy a plaintiff's prima facie case under McDonnell Douglas. But such evidence is not always necessary. A plaintiff may rely on direct evidence of what the defendant did and said in satisfying her initial burden under McDonnell Douglas").

It is undisputed that Hassett was the sole decisionmaker for Roginsky's reassignment (*see* M&T's Statement of Undisputed Facts [33-2], ¶76(c); Roginsky deposition transcript [33-9] at 97), but Roginsky's own deposition testimony undercuts his claim that Hassett's decision to reassign him (or any of his other actions) was tainted with any inference of discriminatory animus:

"A.  [Hassett] didn't say in my face you are a dirty Jew . . . .  He didn't say in my face you are old, but he was continuously reducing my level of responsibilities in the office, even though I was going a good job.

Q. And does that mean he discriminated against you based on your religion, national origin or age?

A.  That means he discriminated against me, but not based on those things". Roginsky deposition transcript [33-9] at 219-20.[7]  *See also* id. at 40 ("Q. Did Mr. Hassett engage in any discriminatory conduct toward you? A. I wouldn't call that necessarily -- I don't know if I can call it discriminatory, but definitely belittling took place.  Q. So you believe Mr. Hassett belittled you, but you're not sure whether it was discriminatory. Do I have that right?  A. That's correct. Q. How did he belittle you? A. By moving job responsibilities from me without properly

---

[7]      Read in its entirety, Roginsky's testimony establishes that he believed that Morrison, who was never Roginsky's supervisor or manager (M&T's Statement of Undisputed Facts [33-2], ¶30), acted with discriminatory animus, but that Hassett was motivated by no more than office politics. When initially asked whether he believed that the decision of Hassett, Morrison and Ansari to "exclude [him] from meetings was motivated by [his] religion or national origin", he testified "[y]es, I believe that was part of it", explaining that he was "perceived in the organization as Randy[ ] [Chestnut's] man", and when "the team had been taken away from Randy and was going to Mr. Hassett, Mr. Hassett wanted his own resource to control everything, and not Mr. Chestnut['s] resource.  That's just office politics". Id. at 102-03; *see also* 74-75 ("[t]here was animosity going on between technology and the business" sectors of M&T).  However, when Roginsky was next asked whether it was correct that he believed that "Hassett's decisions were motivated by office politics in part and discrimination in part", he responded "[n]ot necessarily, but because of the fact that *Mr. Morrison* did not like . . . that I came from an immigrant background".  Id. at 104 (emphasis added).

assessing the issue").  Therefore, I conclude that Roginsky has failed to establish that his

reassignment occurred under circumstances giving rise to an inference of religious, national

origin, or age discrimination, and even if Roginsky were able to establish a *prima facie* case,

M&T has offered a legitimate non-discriminatory reason for the reassignment (*see* Hassett

Declaration [33-33], ¶5 (Roginsky's skillset and prior experience aligned with the position);

Hassett Reply Declaration [41-2], ¶4),[8] and Roginsky has failed to offer evidence that religious,

national origin or age discrimination was a contributing or motivating factor for Hassett's

decision to reassign him.  While he may disagree that his talents were best utilized in the Data

Quality role, that is not enough to demonstrate that the reassignment was pretextual. *See* Carter

v. Autozoners, LLC, 807 F. App'x 131, 132–33 (2d Cir. 2020) (Summary Order) ("Title VII . . .

do[es] not empower us to second-guess the wisdom of a business's discretionary employment

decisions").

        Even if I were to disregard Roginsky's own testimony that Hassett's actions were

not motivated by discrimination based on a protected characteristic, the only evidence of Hassett

possessing potentially discriminatory motives relates to the claim of age discrimination.

Specifically, Roginsky testified that he overheard a conversation between Morrison and Hassett

that it was difficult for M&T to get rid of employees once they reached 47 years of age (albeit he

could not recall when or how he overheard it). Roginsky deposition transcript [33-9] at 129-30.

*See also* Verified Complaint [1], ¶44. Although this might satisfy Roginsky's *prima facie* burden

of establishing an inference of age discrimination, as discussed above, at this stage of an ADEA

claim, he "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of

---

[8]     Roginsky himself heard Hassett say that M&T "needed depth in data and was in need of data
people". Verified Complaint [1], ¶51.

the challenged adverse employment action". <u>Gross v. FBL Financial Services, Inc.</u>, 557 U.S.

167, 180 (2009).  Hence, age cannot have been "just a contributing or motivating factor", but

must have been the "but-for cause". <u>Gorzynski</u>, 596 F.3d at 106. *See also* <u>Szewczyk v. City of</u>

<u>New York</u>, 2021 WL 2010504, *5 (E.D.N.Y. 2021) ("[t]o defeat summary judgment in an

ADEA claim, the standard is higher and a plaintiff must prove, by a preponderance of the

evidence, that age was the 'but-for' cause of the adverse action, as opposed to merely being a

motivating factor").  Given the complete record, the conversation that Roginsky overheard falls

short of establishing that age was the "but for" cause of the reassignment. Under these

circumstances, I recommend that M&T be granted summary judgment on this portion of

Roginsky's claim.


### 2.      Promotion Denials

"[F]ailure to promote an employee is considered one of the archetypal examples

of an adverse employment action under Title VII." <u>Ragin v. E. Ramapo Central School District</u>,

2010 WL 1326779, *21 (S.D.N.Y. 2010), <u>aff'd</u>, 417 F. App'x 81 (2d Cir. 2011).  In order for the

denial of a promotion to constitute an adverse employment action, a plaintiff must "allege

that . . .  he applied for a specific position or positions and was rejected therefrom, rather than

merely assert[ ] that on several occasions . . .  he generally requested promotion". <u>Brown v.</u>

<u>Coach Stores, Inc.</u>, 163 F.3d 706, 710 (2d Cir. 1998).  M&T argues that Roginsky falls short of

this showing because he was unable to identify at his deposition the positions that he was denied.

M&T's Memorandum of Law [33-1] at 19.  However, in response to the motion, Roginsky

submits e-mails from M&T indicating that he was not selected for three positions that he applied

for in August and October 2018 (Roginsky Affidavit [38], ¶13; [38-1] at 2, 5, 6), which, in the

absence of any other arguments from M&T, are sufficient to satisfy his *prima facie* burden of establishing that he suffered an adverse employment action.

Alternatively, M&T argues that Roginsky cannot establish that the promotion denials arose under circumstances that gave rise to an inference of discrimination, because he offers no evidence of the qualifications or identity of the individuals who obtained these positions -*i.e.*, lacks evidence that he was treated less favorably than a similarly situated employee outside of his protected group. M&T's Memorandum of Law [33-1] at 19. *See* Haughton v. Town of Cromwell, 2021 WL 4248858, *5 (D. Conn. 2021) ("[p]romotion of a similarly situated employee not in the plaintiff's protected group is sufficient to support an inference of discrimination"). Roginsky does not dispute that he lacks evidence of disparate treatment, but instead contends that an inference of discrimination arises from the fact that prior to him being denied these positions, he overheard a conversation between Morrison and Hassett that it was not "easy for the bank to get rid" of a person 47 years old (Roginsky deposition transcript [33-9] at 130-31), and also heard an unidentified individual in September 2018 state that "Russians are not team players". Id. at 138-39 ("Q. Did you visually observe the person who said that? A. I did not"). *See* Roginsky's Memorandum of Law [38-4] at 8.

An inference of discriminatory motive can arise from "actions or remarks made by *decisionmakers* that could be viewed as reflecting a discriminatory animus", Chertkova, 92 F.3d at 91 (emphasis added), but Hassett denies having any role in filling the positions that Roginsky applied for, which were outside of his department (Hassett Reply Declaration [41-2], ¶6), and Morrison states that he was never Roginsky's direct or indirect supervisor, never worked in his department, never evaluated him, and never denied Roginsky a promotion. Morrison Declaration [33-37], ¶¶3, 26. Roginsky's evidence, which fails to attribute the comments to the

decisionmakers or others involved in the hiring process, falls short of raising an inference that discrimination played a role in him not being hired for these positions. *See* Patton, 2017 WL 2177621, *9 ("[t]he Plaintiff has come forward with no evidence suggesting that the comments and incidents were made or condoned by anyone with authority over hiring decisions. She has, in other words, not made a prima facie case that the comments and incidents might have had any bearing on her not being promoted"); Gilmore v. Lancer Insurance Co., 2010 WL 87587, *10 (E.D.N.Y. 2010) (an unnamed supervisor's statement that "men here don't get promoted" did not give rise to an inference of discrimination because there was "no evidence that the supervisor played any role in defendant's decision to fire plaintiff").

Without more, Roginsky's claim that he was "highly qualified" for the positions he was denied (Roginsky Affidavit [38], ¶14), falls well short of creating an inference that it was discriminatory. *See* Loris v. Moore, 344 F. App'x 710, 712 (2d Cir. 2009) (Summary Order) (where the plaintiff "failed to adduce any competent evidence of the qualifications of the individual selected for the position . . . . [i]t follows that she cannot demonstrate that her qualifications were 'so superior to the credentials of the person selected' as to give rise to an inference of discrimination").

### 3.    Paid Leave

Generally, "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action". Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006). *See also* Laface v. Eastern Suffolk Boces, 349 F. Supp. 3d 126, 150 (E.D.N.Y. 2018) (placement "on temporary paid administrative leave is not an adverse employment action"). Although Roginsky's placement on leave to undergo a medical examination to determine his fitness to return to work may have been perceived by Roginsky to

be unwarranted, it is undisputed that it resulted in *no* diminution in pay or benefits. M&T's

Statement of Undisputed Facts [33-2], ¶160.  Nor does he offer evidence of "something more".

Upon completion of the examination, Roginsky was cleared for work without any discipline or

corrective action, and he returned to the same position with no change in his responsibilities. Id.,

¶¶159-61. S*ee* Canady v. Union 1199, 253 F. Supp. 3d 547, 558 (W.D.N.Y. 2017), aff'd, 736 F.

App'x 259 (2d Cir. 2018) (finding no adverse employment action where the plaintiff offered "no

evidence that [his employer] took any action beyond the temporary paid suspension, or that the

suspension had any negative affect on his employment"); Forgione v. City of New York, 2012

WL 4049832, *5 (E.D.N.Y. 2012) ("[a]lthough Forgione may have perceived the referrals [for

psychological evaluation] as inconvenient and unwarranted, and although they may have carried

negative connotations, they did not effect a materially adverse change in his working

conditions").  Roginsky's reliance on Winslow v. Pulaski Academy, 448 F. Supp. 3d 197

(N.D.N.Y. 2020) does not compel a different conclusion.  There, the plaintiff's administrative

leave was accompanied by a loss of "tuition reimbursement and insurance benefits", which

rendered it an adverse employment action. Id. at 208.  By contrast, no such loss of benefits

occurred here.

> Nevertheless, even if Roginsky's placement on leave constituted an adverse action,

M&T has offered legitimate non-discriminatory reasons for its decision to do so (*i.e.*, concern for

the well-being of Roginsky and his co-workers), and Roginsky has offered no evidence of

pretext.  While he points to the fact that he was "successfully doing his job" (Roginsky's

Memorandum of Law [38-4] at 9), his work performance, even if exemplary, did not obligate

M&T to ignore what it perceived to be a potential safety concern. *See* Frank Declaration [33-20],

¶19 ("M&T's decision was motivated by a legitimate, good-faith concern for Mr. Roginsky's

well-being and the well-being of those working with him"). It may be debatable whether the content of the journal justified placing plaintiff on leave, but that is besides the point. "[I]t is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. District courts do not have a roving commission to review business judgments and may not sit as super personnel departments, assessing the merits - or even the rationality -of employers' non-discriminatory business decisions. Thus, evidence that an employer made a poor business judgment in its adverse employment decisions generally is insufficient to establish a genuine issue of fact as to the credibility of the defendant's] reasons, the reasons tendered need not be well-advised, but merely truthful." Lopez v. White Plains Hospital, 2022 WL 1004188, *12 (S.D.N.Y. 2022).

See also Ghent v. Moore, 324 F. App'x 55, 57 (2d Cir. 2009) (Summary Order) ("while it is possible to dispute whether . . . Plaintiff's performance as a mentor really justified taking away his mentoring responsibilities, to do so would require a court to 'sit as a super-personnel department' to reexamine whether an employee's performance was really deficient, something that . . . courts should not do"); Bourara v. New York Hotel Trades Council & Hotel Association of New York City, Inc., Employee Benefit Funds, 2021 WL 4851384, *2 (2d Cir. 2021) (Summary Order) ("Bourara's disagreement with Defendant's decision to treat his actions as a major infraction rather than a minor one does not transform that judgment call into a policy deviation, much less evidence of pretext for discrimination").  Under these circumstances, I recommend that M&T be granted summary judgment on this portion of Roginsky's claim.

### E.     Hostile Work/Constructive Discharge

As recently explained by the Second Circuit:

"A hostile work environment claim requires a plaintiff to show that his or her

workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his or] her employment were thereby altered. This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. The incidents typically must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. A single incident may qualify, but to do so it must be extraordinarily severe. Furthermore, the plaintiff must demonstrate that the conduct occurred because of his protected status . . . and also that a specific basis exists for imputing the conduct that created the hostile environment to the employer".

Agosto v. New York City Department of Education, 982 F.3d 86, 101-02 (2d Cir. 2020).

"Constructive discharge is a subset of 'hostile work environment'", Zick v. Waterfront Commission of New York Harbor, 2012 WL 4785703, *7 (S.D.N.Y. 2012), "arising out of particularly pronounced hostile work environments". Pryor v. Jaffe & Asher, LLP, 992 F. Supp. 2d 252, 257 (S.D.N.Y. 2014).  The standards for assessing Roginsky's hostile work environment and constructive discharge claims are the same under Title VII, the ADEA and the NYSHRL. See Williams v. New York City Housing Authority, 2021 WL 1109842, *20 (S.D.N.Y. 2021); Murtha v. New York State Gaming Commission, 2019 WL 4450687, *7 (S.D.N.Y. 2019); Bryant v. Greater New Haven Transit District, 2014 WL 2993754, *9 (D. Conn. 2014).

While the allegations of the Verified Complaint are expansive and detail a number of incidents that individually and in the aggregate could support Roginsky's hostile work environment claim, as outlined in my OSC, discovery has demonstrated that Roginsky is unable to offer anything more than speculation to attribute a number of the more severe incidents to M&T or its employees (e.g., the Dominican Republic and wake incidents, the placement of a map of Russia on his lawn, and he and his wife being reported as spies and called thieves). Moreover, I question whether the alleged conduct that occurred outside of the workplace can support a hostile work environment claim.  See Torres v. City of New York, 2019 WL 1765223,

*4 (S.D.N.Y. 2019) ("[b]ecause [the] actions were 'not part of the work environment,' they cannot form the basis of a hostile work environment claim" (citing cases)).

Among the workplace occurrences that Roginsky relies upon, he contends that his placement on leave pending a medical clearance to return to work was "so severe" that it established a hostile work environment. Roginsky's Memorandum of Law [38-4] at 13.  That may be so, but for the reasons discussed above, there is no evidence that the decision to place Roginsky on leave was tainted with discriminatory animus.  *See* Bryant v. Central Square Central School District, 2022 WL 561531, *4 (N.D.N.Y. 2022) ("[c]ourts regularly grant summary judgment when there is no 'causal connection' between the alleged hostile acts and the protected characteristic. Indeed, federal anti-discrimination statutes are not intended to create a generalized civility code for the workplace").

Of the alleged harassment and discrimination Roginsky endured at the workplace, he contends that "*much* of [it] was at the hands of his supervisors, specifically Hassett (who demoted [him] and moved him to the cubicle, and then excluded him from communications and meetings), Beno (who yelled at [him], told [him] he 'likes to deal with a tough Russian,' and told [him] about his family connections to Hitler), and Morrison (who excluded [him] from communications)". Roginsky's Memorandum of Law [38-4] at 17 (emphasis added).

First, as M&T argues, "[i]t is undisputed that Hassett never harassed or discriminated against Roginsky". M&T's Memorandum of Law [33-1].  Roginsky himself conceded that Hassett's conduct was not the result of religious, national origin, or age discrimination. Roginsky deposition transcript [33-9] at 219-20.  Hence, even though Hassett was responsible for Roginsky's reassignment, neither that conduct, nor any of his other conduct, was based on a protected characteristic. *See* Gregory v. Daly, 243 F.3d 687, 694 (2d Cir. 2001)

(there must be "factual circumstances that permit the inference that plaintiff was subjected to a hostile work environment because of [his protected status]").

While Roginsky characterizes Morrison as one "of his supervisors" (Roginsky's Memorandum of Law [38-4] at 17), it is undisputed that Morrison was never Roginsky's supervisor or manager. M&T's Statement of Undisputed Facts [33-2], ¶30. *See* Vance v. Ball State University, 570 U.S. 421, 424 (2013) ("an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim"). In any event, standing alone, Morrison's alleged exclusion of Roginsky from meetings, is insufficient to establish a hostile work environment. *See* Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 119 (2d Cir. 2010) (Summary Order) (allegations "that defendants wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her" failed to support a finding of a hostile work environment that was pervasive or severe); Davis-Molinia v. Port Authority of New York & New Jersey, 2011 WL 4000997, *11 (S.D.N.Y. 2011), aff'd, 488 Fed. App'x 530 (2d Cir. 2012) (the Second Circuit affirmed the district court's grant of summary judgment dismissing the two co-plaintiffs' hostile work environment claims, where one plaintiff's supervisor "took away his job responsibilities and excluded him from important meetings and the other plaintiff's supervisors over the course of several years "excluded her from staff meetings that concerned her job functions and duties" and "diminished her responsibilities and gave them to the clerks".  In doing so, the district court explained that "[t]he gravamen of their claims is rooted in conduct that amounts to nothing more than workplace dynamics").

The only supervisor of Roginsky's who allegedly undertook conduct as a result of his protected status that contributed to a hostile work environment was Beno, who discussed his grandfather being associated with the Hitler Youth and stated that he "likes to deal with a tough Russian" in late 2013 or early 2014. M&T's Statement of Undisputed Facts [33-2], ¶¶51-52. However, as M&T argues, standing alone, it is doubtful whether these isolated comments, even by a supervisor, were sufficient to create a hostile work environment. *See* Lessambo v. PricewaterhouseCoopers, L.P., 2010 WL 3958787, *11 (S.D.N.Y. 2010) (a supervisor's "three offensive remarks" about an employee's national origin did not create a hostile work environment).

In addition to the alleged supervisory harassment Roginsky experienced, he points to being the recipient of "regular harassment and hostility in the form of offensive comments and gestures". Roginsky's Memorandum of Law [38-4] at 17, 12 (was "subjected to nearly 'daily' or 'very frequent' harassment, including offensive comments about his religion and national origin . . . [and] harassing physical jokes about his religion (such as leaving money on the floor in hopes he would pick it up)"). Although this would arguably be sufficient to establish a hostile work environment,[9] Roginsky has failed to identify even a single M&T employee who allegedly called him a "dirty Jew" or made other discriminatory epithets despite alleging that he heard that phrase and similar phrases "very frequently" during the course of his nearly five and a half years

---

[9]      *See* Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) ("Feingold has offered proof sufficient to allow a fact-finder to conclude that he experienced pervasive discriminatory intimidation, ridicule, and insult because he was Jewish. Feingold alleges that anti-Semitic remarks . . . were routine"); Gulitz v. DiBartolo, 2010 WL 11712777, *6 (S.D.N.Y. 2010) (where the plaintiff alleged that  anti-Semitic comments were directed "at him on dozens of occasions", and that his co-worker "yelled 'Seig Heil' and simulated a Nazi salute every day" and "wore a swastika in the workplace", "[a] jury could find that these actions, taken together, constituted a 'steady barrage' of discriminatory comments and altered Plaintiff's work environment for the worse").

of employment at M&T. Id. at 46-49 (although he was allegedly referred to as a "stinky Jew" an estimated 500 times at M&T, he could not identify a single person who did so).[10] Nor, with limited exception, does his journal record these allegedly prevalent anti-Semitic slurs (some occurring an estimated 500 times), despite allegedly summarizing the harassment and discrimination that he experienced at M&T. Roginsky deposition transcript [33-9] at 148. This pushes Roginsky's claim of regularly hearing anti-Semetic slurs throughout his tenure at M&T toward being so utterly fanciful that no reasonable juror could believe it. As M&T notes, "[i]f Roginsky was subjected to these types of offensive comments daily . . . surely he should be able to identify at least one person". M&T's Reply Memorandum of Law [41] at 13.  But even treating this as a matter of credibility for a jury to resolve (see Alvarez v. Michael Anthony George Construction Corp., 15 F. Supp. 3d 285, 293 (E.D.N.Y. 2014) ("at the summary judgment stage, the Court may not weigh the credibility of the evidence, regardless of whether that evidence is inherently implausible or in conflict with other, more trustworthy evidence")), Roginsky has failed to impute any of the discriminatory conduct to M&T.  See Susko v. Romano's Macaroni Grill, 142 F. Supp. 2d 333, 338 (E.D.N.Y. 2001) ("[e]ven if a plaintiff

---

[10]      "Facially neutral incidents may be included . . .  among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on [a protected category]." Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002).  Consequently, "when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim". Rasmy v. Marriott International, Inc., 952 F.3d 379, 388 (2d Cir. 2020).  However, since Roginsky fails to identify who made the various anti-Semitic remarks, there is no basis to infer that any of the alleged facially neutral incidents by unidentified perpetrators (see, e.g., M&T's Memorandum of Law [33-1] at 26, §(B)(3)) were in fact discriminatory.  See Hindi v. Port Authority of New York & New Jersey, 2019 WL 2325969, *8 (S.D.N.Y. 2019) ("[b]ecause none of the perpetrators has been identified, a reasonable fact finder could not conclude that each incident was carried out by the same actor or group of actors").  Likewise, without identifying the individuals who allegedly left money being on the workplace floor ([33-9] at 65), the motivation for these occurrences is wholly speculative. See Alabi v. Perdue, 2020 WL 3035218, *8 (D.N.M. 2020), aff'd, 860 F. App'x 576 (10th Cir. 2021) ("the culprit is unidentified, which makes the motivation behind the act impossible to discern").

establishes a hostile work environment claim, to recover against the employer, the plaintiff must establish a basis to impute the harassing conduct to the employer").

An employer's liability for a hostile work environment varies depending on the status of the harassers. *See* Valleriani v. Route 390 Nissan LLC, 41 F. Supp. 3d 307, 317 (W.D.N.Y. 2014) ("[t]he standards for assessing vicarious liability differ depending on the status of the alleged harasser"); Ramirez v. Michael Cetta Inc., 2020 WL 5819551, *11 (S.D.N.Y. 2020); Johnson v. New York State Department of Corrections & Community Supervision, 2021 WL 766864, *24 (W.D.N.Y. 2021).  "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Dabney v. Christmas Tree Shops, 958 F. Supp. 2d 439, 460 (S.D.N.Y. 2013), aff'd, 588 F. App'x 15 (2d Cir. 2014).  On the other hand, "[a]n employer is presumed absolutely liable if the victim's supervisor perpetrated the harassment, though the employer may interpose [the Faragher/Ellerth][11] affirmative defense to rebut that presumption." Harris v. Franziska Racker Centers, Inc., 340 F. Supp. 2d 225, 232 (N.D.N.Y. 2004).

### 1.     **Supervisory Conduct:  The Faragher/Ellerth Defense**

M&T relies heavily on the Faragher/Ellerth defense. M&T's Memorandum of Law [33-1] at 26-29; Reply Memorandum of Law [41] at 13-14.  As discussed above, there is evidence that Beno, who acted as Roginsky's supervisor early in his tenure with M&T, contributed to a hostile work environment through his comments.  As a threshold matter, "[t]he employer may raise the [Faragher/Ellerth] defense . . . only if one of two [initial] elements is

---

[11]     Named for Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

met: either (1) the employee's supervisor took no 'tangible employment action,' which involves

an official company act, against the employee; or (2) any tangible employment action taken

against the employee was not part of the supervisor's discriminatory harassment . . . . Otherwise,

the employer is strictly liable for the supervisor's misconduct." Ferraro v. Kellwood Co., 440

F.3d 96, 101 (2d Cir. 2006).  In addition to that threshold showing,  the employer must establish

"that (1) '[it] exercised reasonable care to prevent and correct promptly any [discriminatory]

harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to take advantage of any

preventive or corrective opportunities provided by [it] or to avoid harm otherwise." Id.

        In opposition to M&T's reliance on this defense, Roginsky argues that "courts

have made expressly clear that this affirmative defense is only available when the harassment

comes from a 'mere co-worker,' not when it comes from a direct supervisor". Roginsky's

Memorandum of Law [38-4] at 16-17 (citing Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d

Cir. 2004)).  That is simply not so. See MacCluskey v. University of Connecticut Health Center,

707 F. App'x 44, 47 (2d Cir. 2017) (Summary Order) ("the Faragher/Ellerth affirmative defense

applies to supervisor harassment"). See also Olsen v. Suffolk County, 2019 WL 1362551, *2

(E.D.N.Y. 2019) ("the Faragher affirmative defense applies when the alleged harasser is the

plaintiff's supervisor, not a coworker or subordinate"); Bartniak v. Cushman & Wakefield, Inc.,

223 F. Supp. 2d 524, 529 (S.D.N.Y. 2002).  In fact, Petrosino, supra expressly undermines

Roginsky's own argument. See 385 F.3d at 225 ("an employer will . . . be liable for a hostile

work environment created by its supervisors unless it successfully establishes [the

Faragher/Ellerth] affirmative defense" (emphasis added)).

        Since Beno - the only supervisor who allegedly acted with any discriminatory

animus - did not take any tangible employment action against Roginsky, I conclude that M&T

may rely on the defense.  As to the first element of the defense, M&T contends that it exercised reasonable care to prevent and correct any harassing behavior by maintaining an anti-harassment policy and reporting procedure that Roginsky was aware of and existed during the entirety of his tenure with M&T. M&T's Memorandum of Law [33-1] at 27.  Roginsky does not dispute the existence of M&T anti-harassment policy or his awareness of it, and while this is "not necessarily dispositive", it is "an important consideration in determining whether the employer has satisfied the first prong of this defense".  Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001).

M&T has also satisfied the second element of the defense by demonstrating that Roginsky failed to avail himself of M&T's complaint procedure with respect to Beno's conduct. See Helmin Declaration [41-3], ¶2 (M&T's internal complaint system contains no record of Roginsky ever submitting a complaint about Beno).  In an effort to raise a triable issue of fact, Roginsky relies upon his initial testimony (Roginsky's Memorandum of Law [38-4] at 14) that he "reported [Beno] for inappropriate behavior . . . . [t]hrough the portal". Roginsky deposition transcript [33-9] at 37.  Yet, when asked about what portal he used, Roginsky acknowledged, "I don't remember that part", and then when pressed whether he was sure that he had reported Beno's conduct, he testified "I do not remember if I reported Mr. Beno's conduct . . . . I don't remember how I reported it, but somehow HR got engaged". Id. at 37-38. See also 39 (Q. "Did you report Mr. Beno's conduct to human resources? A. I don't remember whether I did or not, but somehow HR got involved"). According to M&T, Roginsky's reference in his testimony to Human Resources getting involved was to M&T's 2018 investigation. See M&T's Statement of Undisputed Facts [33-2] at 11 n.3.  This is not disputed by Roginsky.

As discussed above, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005); D'Amico, 132 F.3d at 149. *See also* Pinero v. Burbran, 2021 WL 4224727, *2 (S.D.N.Y. 2021) ("[t]he Court is not required to adopt a version of events so utterly discredited by the record that no reasonable jury could have believed it"). Roginsky's equivocal testimony, which reflects a general lack of recollection as to whether he complained about Beno's conduct or how, when or why Human Resources may have gotten involved, falls short of raising a triable issue of fact to as to whether Roginsky availed himself of M&T's complaint process. Petrunti v. Cablevision, 2009 WL 5214495, *11 (E.D.N.Y. 2009) ("[p]laintiff's lack of recollection is insufficient . . . to create a triable issue of fact"); Hinz v. Village of Perry, 2015 WL 3849558, *7 (W.D.N.Y. 2015), aff'd, 667 F. App'x 3 (2d Cir. 2016) ("[a] party cannot avoid summary judgment by claiming to be unable to remember facts that are asserted and properly supported by the moving party").

As it is undisputed that Roginsky made complaints to Frank in July and September 2018 concerning workplace harassment, there is no evidence that these included any complaints about Beno.  In any event, for the reasons discussed below, by not participating in Frank's investigation in contravention to M&T's policy and his own assurances that he would do so, Roginsky unreasonably failed to take advantage of M&T's corrective measures. M&T's Statement of Undisputed Facts [33-2], ¶22.

### 2.     Co-Workers

"By contrast to harassment by supervisors, harassment by co-workers generally does not subject an employer to liability unless the plaintiff proves that management knew of or

should have known of the hostile work environment and failed to take reasonable remedial action to stop the harassment." Rios v. Buffalo & Fort Erie Public Bridge Authority, 2007 WL 4991189, *11 (W.D.N.Y. 2007), adopted, 2008 WL 657121 (W.D.N.Y. 2008), aff'd, 326 F. App'x 612 (2d Cir. 2009).  *See also* Martin v. New York, 799 F. App'x 68, 69 (2d Cir. 2020) (Summary Order) ("we apply a negligence standard to determine whether an employer may be held liable for a hostile work environment that was created by a coworker who was not the victim's supervisor"); Vance, 570 U.S. at 424 ("[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions"); Valleriani, 41 F. Supp. 3d at 317 ("if the alleged harasser is a co-worker, the burden remains with the plaintiff and an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it").

Viewing the evidence in a light most favorable to Roginsky, I conclude that he has failed to offer any evidence that M&T knew or should have known of the alleged workplace harassment prior to his initial complaints in July 2018, or that it was negligent in addressing Roginsky's complaints once it became aware of them.  Roginsky's July 2018 complaints to Frank were generalized, with him only reporting only that he heard unidentified "people around the office uttering discriminatory slurs toward" him. Roginsky Affidavit [38], ¶9; M&T's Statement of Undisputed Facts [33-2], ¶122.  Faced with the fact that Roginsky worked on a floor with approximately 1,000 other M&T employees (M&T's Statement of Undisputed Facts [33-2], ¶41), Frank reasonably requested additional details to investigate his concerns, but this was not provided by Roginsky or his counsel. Frank Declaration [33-20], ¶¶13-15.

Roginsky's journal provided little more for Frank to conduct an investigation. When Frank met with Roginsky after her receipt of the journal, it is undisputed that Roginsky failed to identify any of the individuals who made the inappropriate comments memorialized in his journal, or even the gender of the voices he heard. M&T's Statement of Undisputed Facts [33-2], ¶149. Nor can M&T be faulted for failing to investigate the more fanciful entries contained in the journal, such as Morrison having him followed by his son's former violin teacher to the Dominican Republic.

While Roginsky now points to the journal as "providing specific details of the hostility, harassment and discrimination he suffered", he informed Frank that it was "not meant to be shared", was "not perfect", and apologized "if the log caused any confusions [*sic*]". *See* Roginsky's October 5, 2018 e-mail to Frank and Lightcap [33-31].  Nor did it contain a trove of information concerning the alleged discrimination Roginsky was experiencing.  Many of the alleged comments he memorialized were without attribution or were facially neutral.  In fact, when asked at his deposition "[w]ho is identified in your log as the perpetrators of the discrimination and harassment?", he only identified Morrison, and when asked if "[a]nybody else?", he only added Ansari and Hassett "to a degree". Roginsky's deposition testimony [33-9] at 218.  Likewise, contrary to his current claim that he "had nothing . . . that could provide greater details" than the journal (Roginsky's Affidavit [38], ¶10), Roginsky did not dispute the need for the statement or his ability to provide one.  In fact, - in apparent consultation with his attorney - he agreed to do so. *See* Roginsky's October 5, 2018 e-mail [33-31] (the attorney "is fully versed on the issues and allegations we are discussing . . . . I will work with [my attorney] on [the statement] and we will provide it to you").

Taking the information she had, Frank reasonably did what she could to investigate Roginsky's claims by speaking not only with Roginsky, but also Lightcap, Morrison and Hassett, who confirmed that they did not observe any discriminatory comments or discriminatory behavior against Roginsky. Frank Declaration [33-20], ¶21.[12]  Under these facts, plaintiff has not established a basis to impute responsibility for the hostile work environment to M&T.

**F.**    **Retaliation**

Like discrimination claims, "[c]ourts analyze claims of . . . retaliation under Title VII, . . . the ADEA, and the NYSHRL by employing the familiar burden-shifting framework established in McDonnell Douglas". Caruso v. Bon Secours Charity Health System, Inc., 703 F. App'x 31, 34 (2d Cir. 2017) (Summary Order).  "The concept of 'adverse employment action' is broader for Title VII retaliation claims than for Title VII discrimination claims and encompasses any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Litten v. GM Components Holdings, LLC, 2022 WL 706971, *8 (W.D.N.Y. 2022) (quoting Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 57 (2006)); Vega v. Hempstead Union Free School District, 801 F.3d 72, 90 (2d Cir. 2015).

---

[12]     Although not addressed by either party, Roginsky testified that in 2016 he spoke to Suszek about the discrimination he was allegedly experiencing. Roginsky deposition transcript [33-9] at 175.  The journal entries under Suszek's name and telephone number - all of which record alleged events occurring in 2018 ([33-28] at 4) - suggests that this more likely occurred in 2018.  See Frank Declaration [33-20], ¶11.  In any event, whether the first report to Suszek occurred in 2016 or 2018, the evidence establishes that his concerns were addressed.  For instance, when asked about the journal entry under Suszek's name that states "[f]ew people went by my office door and made a comment:  Now we cannot harass him again 10:16 a.m. 6/14/2018" ([33-28] at 4), Roginsky explained that "apparently the word got out that [he] raised it to HR, and hence, *HR is taking things seriously* so sort of leave him alone". Roginsky deposition transcript [33-9] at 176 (emphasis added). See also id. at 175 ("I believe [Suszek] took it very seriously").

Notwithstanding the more expansive scope of retaliatory adverse actions, I conclude that M&T's placement of Roginsky on paid leave, shortly after its receipt of his journal and complaints of workplace harassment, was not an adverse action. *See* M&T's Memorandum of Law [33-1] at 30.  As discussed above, M&T reasonably required Roginsky to take leave pending confirmation of his mental well-being, and he makes no claim that his leave, which lasted approximately 45 days, was delayed longer than necessary. *See* Booth v. Connecticut, 2011 WL 3611352, *8 (D. Conn. 2011) ("it is clear that a reasonable jury would not find that placement on paid administrative leave constitutes an adverse employment action for purposes of a Title VII retaliation claim when an internal investigation is pending").  In any event, even if this constituted an adverse employment action, for the reasons discussed above, there was a legitimate non-discriminatory reason for Roginsky's placement on leave, and Roginsky has failed to offer evidence of pretext.  Although Roginsky's placement on leave came on the heels of his complaint of discrimination, "mere temporal proximity between a complaint and the alleged retaliatory act is insufficient to establish pretext at the summary judgment stage". Hawkins v. New York State Office of Mental Health, 845 F. App'x 9, 11 (2d Cir. 2021) (Summary Order). Therefore, I recommend that this claim be dismissed.[13]

## CONCLUSION

For these reasons, I recommend that M&T's motion for summary judgment [33] be granted. Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the clerk of this court by July 5, 2022. Any requests for

---

[13]     Because of my recommendation that Roginsky's claims be dismissed, I have not addressed the portion of M&T's motion addressing his damages. *See* M&T's Memorandum of Law [33-1] at 31.

extension of this deadline must be made to Judge Vilardo.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated:  June 21, 2022

/s/Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge

-41-